# In the United States Court of Federal Claims

No. 14-1170C
(Filed: September 18, 2015)

| | |
|---|---|
| CSX TRANSPORTATION, INC., ) ) Plaintiff, ) ) v. ) ) THE UNITED STATES OF AMERICA, ) ) Defendant. ) ) ) ) | ) Subject Matter Jurisdiction; Breach of Contract; Contract Disputes Act; Procurement Contract; Bailment Agreement; Certified Claim; Defective Certification |

*Christopher Jordan Merrick*, Keenan Cohen & Merrick, P.C., Jenkintown, PA, for plaintiff.

*Kara Marie Westercamp*, Trial Attorney, with whom were *Benjamin C. Mizer*, Pricipal Deputy Assistant Attorney General, *Robert E. Kirschman, Jr.*, Director, and *Steven J. Gillingham*, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant.

## OPINION AND ORDER

This breach of contract case is before the Court on the government's motion to dismiss pursuant to Rule 12(b)(1) of the Rules of the Court of Federal Claims ("RCFC"). The government argues that the Court lacks subject matter jurisdiction because the plaintiff, CSX Transportation, Inc. ("CSX"), did not file a certified claim with the contracting officer, as required by the Contract Disputes Act ("CDA"), 41 U.S.C. § 7104 (2012). As explained below, the Court agrees, and therefore CSX's complaint must be **DISMISSED**.

## BACKGROUND

CSX, an interstate rail carrier, owns a railway that passes near Fort Stewart, Georgia, the location of the United States Garrison Command ("the Installation"). A spur line connects the main railway to the Installation. See Def's Mot. to Dismiss Ex. 1 at 9, CSX Transp., Inc. v. United States, No. 4:13-cv-208 (S.D. Ga. Dec. 20, 2013), ECF No. 12 (diagramming the track intersection). The spur line runs parallel to the main railway

for a short distance before veering off towards the Installation.  Id.  This short stretch of parallel track is called the "sidetrack."  Id. at 1.

On January 23, 2006, CSX, the Installation, and the Army Corps of Engineers ("COE") entered into a contract (the "Sidetrack Agreement") concerning the use of the sidetrack.  See Compl. Ex. A.  Under the contract, the Installation and the COE leased a portion of the right-of-way along the sidetrack from CSX.  See id. ¶¶ 6.1–6.5.  The parties also agreed that "when [a] railcar has been placed on [the sidetrack] . . . . possession of the railcar and its contents shall be transferred to [the] Installation."  Id. ¶ 7.3.  The Installation would then be "responsible for all railcars and their contents while in Installation's possession" and would "assume[] all responsibility for payment of all damage to any railcar and its contents that may occur during that time, even if caused by third parties."  Id. ¶ 7.4.

On or about October 8, 2010, CSX delivered forty-four railcars to the Installation via the sidetrack.[1]  Am. Compl. ¶ 9.  The railcars CSX provided to the Installation were leased from TTX Company ("TTX") and included tie-down and other equipment necessary for their use and operation.  Am. Compl. ¶ 11; see Def.'s Mot. to Dismiss ("Def.'s Mot.") App. at 15.  The Army thereafter moved the railcars onto the base and unloaded them within a fenced-in area.  Am. Compl. ¶ 14.  After unloading the railcars, the Army moved them to unfenced rail sidings located outside the base: twenty-two were moved to the "Shaw Road" siding and eleven to the "Beer Joint" siding.  Id. ¶¶ 14–16.

On April 14, 2011, CSX discovered that third parties had vandalized and stolen tie-down chains and related equipment from the thirty-three railcars.  Def's Mot. at 2.  On September 1, 2011, the owner and lessor of the railcars, TTX, submitted an administrative claim to the Army in the amount of $262,042.16 for property damage to the railcars.  Def.'s Mot. App. at 17, 21–23.

The United States Army Claims Service ("USARCS") denied TTX's claim on December 13, 2011.  Id. at 44–48.[2]  TTX then billed CSX $267,238.14 for repairs and/or replacement for the thirty-three railcars and eleven other railcars that sustained similar damage.  Id. at 17–18.

---

[1] The contract governing the ordering of these railcars is not at issue in this case.

[2] TTX had asserted claims under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 2671–80, and the Military Claims Act ("MCA"), 10 U.S.C. § 2733, as implemented by Chapter 3, Army Regulation ("AR") 27-20.  Def.'s Mot. App. at 44.  The Army's basis for denying TTX's FTCA claim was, first, that the individuals who stole TTX's tie-down equipment were not federal employees; and second, that, assuming TTX was an invitee, "under Georgia law, there is no duty to protect invitees from the criminal acts of third parties."  Id.  The Army's basis for denying TTX's MCA claim was that TTX's "cars were not turned over to the Army for safekeeping and, thus, no bailment arose."  Id.

Thereafter, on September 26, 2012, CSX executed a Standard Form 95, which is a government-wide form approved by the Office of Management and Budget for use in filing administrative claims under the Federal Tort Claims Act. Id. at 15–20; see 28 C.F.R. § 14.2. In the form and an attachment submitted along with the form, CSX sought compensation from the Army in the amount of $267,238.14 "for injury to and loss of property due to the negligence or wrongful act or omission of a civilian officer or employee of . . . [t]he Army." Def.'s Mot. App. at 15–20. In addition to citing the Federal Tort Claims Act, CSX cited the Military Claims Act, 10 U.S.C. § 2733, "and other applicable law" as the basis for its claim. It further stated in the claim that "[s]tate law imposes duties and obligations on the Army as the bailee for these railcars." Def.'s Mot. App. at 18. Finally, CSX quoted paragraph 7.4 of the Sidetrack Agreement and asserted that, "[a]pplying the standard of care contained in the agreement between the parties the government should pay this claim to CSX." Id. at 19.

CSX sent its claim via certified mail to various offices within the Army, including USARCS, the Army Garrison Command at Fort Stewart and Hunter Army Airfield, the Army Corps of Engineers, and the Army Installation Management Command in Fort Sam Houston, Texas. The only Army agency that responded, however, was USARCS. In a letter dated March 13, 2013, and signed by the chief of the Tort Claims Division, USARCS denied the claim. Id. at 49–50. The letter explained that because CSX was a subrogee of TTX, and "[as] subrogation rights arise from the substitution of one person in place of another, [CSX's] rights to recover are limited to the rights that TTX would have to recover from the original claim." Id. at 49. The letter further explained:

> TTX had six months from the mailing date of the [letter denying its claim] to file suit under the FTCA, and 60 days from receipt of that same letter to file an appeal under the MCA. TTX's right to recover expired when both of those deadlines passed without action taken by TTX. Accordingly, CSX's subrogation rights have also expired.

Id.

After a failed appeal of the administrative claim, CSX filed suit in the United States District Court for the Southern District of Georgia, alleging both tort and contract claims. Am. Compl. at 1 n.1, CSX Transp., Inc. v. United States, No. 4:13-cv-208 (S.D. Ga. Dec. 20, 2013), ECF No. 14. The government moved to dismiss that action for lack of subject matter jurisdiction, arguing, among other things, that the dispute was one of contract, rather than tort, and thus was under the exclusive jurisdiction of the Court of Federal Claims. Transfer Order at 3, ECF No. 1-1. The district court agreed and transferred CSX's case to this Court. Id. at 12–13.

CSX filed an amended complaint in this Court on January 5, 2015, alleging breach of the Sidetrack Agreement and requesting damages in the amount of $267,238.14, plus interest. Am. Compl. at 2, 4, ECF No. 4. Thereafter, the government filed the motion to dismiss that is currently before the Court.

3

**DISCUSSION**

**I.     Legal Standards**

   **A.  Motion to Dismiss Under RCFC 12(b)(1)**

Whether this Court has jurisdiction to decide a case is a threshold matter, and, if no jurisdiction exists, the Court must order dismissal without proceeding further. See PODS, Inc. v. Porta Stor, Inc., 484 F.3d 1359, 1365 (Fed. Cir. 2007) (citing Steel Co. v. Citizens for a Better Env't, 523 U.S. 83 (1998)). In deciding a motion to dismiss for lack of subject matter jurisdiction, the court accepts as true all undisputed facts in the plaintiff's complaint and draws all reasonable inferences in favor of the plaintiff. Trusted Integration, Inc. v. United States, 659 F.3d 1159, 1163 (Fed. Cir. 2011). If subject matter jurisdiction is challenged, however, the plaintiff cannot rely merely on allegations in the complaint, but must instead bring forth relevant, competent proof to establish jurisdiction. Reynolds v. Army & Air Force Exch. Serv., 846 F.2d 746, 748 (Fed. Cir. 1998). The party invoking a court's jurisdiction bears the burden of establishing it, and must ultimately do so by a preponderance of the evidence. Id.; Rocovich v. United States, 933 F.2d 991, 993 (Fed. Cir. 1991).

   **B.  Tucker Act Jurisdiction**

Pursuant to the Tucker Act, the United States Court of Federal Claims may "render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a) (2012). Subsection (a)(2) of the Tucker Act further grants the Court of Federal Claims "jurisdiction to render judgment upon any claim by or against, or dispute with, a contractor arising under section 7104(b)(1) of title 41"—that is, the CDA—"including a dispute concerning termination of a contract, rights in tangible or intangible property, compliance with cost accounting standards, and other nonmonetary disputes on which a decision of the contracting officer has been issued under section 6 of that Act."

   **C.  The Contract Disputes Act**

The CDA covers any claims based upon "any express or implied contract . . . made by an executive agency for—(1) the procurement of property, other than real property in being; (2) the procurement of services; (3) the procurement of construction, alteration, repair, or maintenance of real property; or (4) the disposal of personal property." 41 U.S.C. § 7102(a). Therefore, "the CDA does not apply to the provision of services by the government, but only to the procurement of such services." Fla. Power & Light Co. v. United States, 307 F.3d 1364, 1371 (Fed. Cir. 2002). Under the CDA, "procurement" means "the acquisition by purchase, lease or barter, of property or services for the direct benefit or use of the Federal Government . . . ." New Era Constr. v. United States, 890 F.2d 1152, 1157 (Fed. Cir. 1989) (emphasis omitted). Moreover, the CDA applies even if procurement is only one aspect of a multi-purpose contract. See

Bonneville Assocs. v. United States, 43 F.3d 649, 654–55 (Fed. Cir. 1994) (holding that it would "be incongruous for the [B]oard [of Contract Appeals] to have jurisdiction to construe one part of the contract, but not the other"); Forman v. United States, 767 F.2d 875, 879 (Fed. Cir. 1985).

The CDA sets forth its own jurisdictional requirements. See M. Maropakis Carpentry, Inc. v. United States, 609 F.3d 1323, 1327 (Fed. Cir. 2010). It states that a contractor may bring an action de novo in federal court "within 12 months from the date of receipt of a contracting officer's decision." 41 U.S.C. § 7104(b). Thus, the Federal Circuit has held that, for the Court of Federal Claims to possess jurisdiction, the contractor must have first submitted a valid claim to its contracting officer and received the contracting officer's final decision on that claim. M. Maropakis Carpentry, Inc., 609 F.3d at 1327.

The definition of "claim" for purposes of the CDA derives from the Federal Acquisition Regulations ("FAR"), which implement the CDA. See id. FAR 2.101 provides, in pertinent part that "claim" means "a written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain, the adjustment or interpretation of contract terms, or other relief arising under or relating to the contract." Id., see also FAR 52.233-1 (setting forth, in a standard contract clause, the same definition of "claim" as in FAR 2.101). The Federal Circuit, interpreting this provision, has held that a valid CDA claim consists of three components: "(1) a written demand, (2) seeking, as a matter of right, (3) the payment of money in a sum certain." Northrop Grumman Computing Sys., Inc. v. United States, 709 F.3d 1107, 1112 (Fed. Cir. 2013) (citing Reflectone, Inc. v. Dalton, 60 F.3d 1572, 1575–76 (Fed. Cir. 1995)). The Federal Circuit has further explained that "[w]hile a valid claim under the CDA must contain 'a clear and unequivocal statement that gives the contracting officer adequate notice of the basis and amount of the claim,' the claim need not take any particular form or use any particular wording." Id. (quoting Contract Cleaning Maint., Inc. v. United States, 811 F.2d 586, 592 (Fed.Cir.1987)). "All that is required," the Federal Circuit has observed, "is that the contractor submit in writing to the contracting officer a clear and unequivocal statement that gives the contracting officer adequate notice of the basis and amount of the claim." Id. (quoting Contract Cleaning Maint., Inc., 811 F.2d at 592).

For claims seeking more than $100,000, FAR 2.101 additionally incorporates within the definition of "claim" the CDA's certification requirement, located at 41 U.S.C. § 7103(b)(1). That requirement provides as follows:

5

> For claims of more than $100,000 made by a contractor, the contractor shall certify that--
> (A) the claim is made in good faith;
> (B) the supporting data are accurate and complete to the best of the contractor's knowledge and belief;
> (C) the amount requested accurately reflects the contract adjustment for which the contractor believes the Federal Government is liable; and
> (D) the certifier is authorized to certify the claim on behalf of the contractor.

Id.; see also FAR 33.207(c) (providing specific certification language, which includes the language of § 7103(b)(1) nearly verbatim).

Section 7103(b)(3) clarifies, however, that contractors have an opportunity to correct a certification that does not strictly adhere to the requirements of § 7103(b)(1). Specifically, it provides that:

> A defect in the certification of a claim does not deprive a court or an agency board of jurisdiction over the claim. Prior to the entry of a final judgment by a court or a decision by an agency board, the court or agency board shall require a defective certification to be corrected.

41 U.S.C. § 7103(b)(3). Thus, "[a]lthough certification of a claim is a jurisdictional prerequisite to suing in this court under the CDA, if a contractor attempts to certify a claim, but the certification is defective, the court retains jurisdiction over the claim, but the contractor must correct the defect." Sam Gray Enters., Inc. v. United States, 32 Fed. Cl. 526, 529 (1995) (citing Hamza v. United States, 31 Fed. Cl. 315, 324 (1994)); see also M. Maropakis Carpentry, Inc., 609 F.3d at 1329 ("[W]hile technical compliance with certification is not a jurisdictional prerequisite to litigation of a contractor's claim under the CDA, it is a requirement to the maintenance of such an action.").

## II. Application of Standards

### A. CSX's claims fall under the CDA

As noted above, for purposes of the CDA, a "procurement" means "the acquisition by purchase, lease or barter, of property or services for the direct benefit or use of the Federal Government . . . ." New Era Constr., 890 F.2d at 1157. The Sidetrack Agreement clearly falls within this category. Thus, as Section 1.1 provides, "[t]he purpose of this Agreement is to detail the provisions of the maintenance and use of Private Sidetrack Nos. A and B for the tender and receipt of rail freight traffic for the account of Installation, and the granting of a lease over real property owned by Railroad to COE." Am Compl. Ex. A at 1 (emphasis added). Moreover, it provides:

> The parties understand that the Installation uses the Sidetrack as a critical link in a world-wide power projection platform to deploy and

6

>redeploy tanks, weapons and munitions required by a heavy infantry division garrisoned on Installation to locations around the world for wars, armed conflicts less than war and other national military contingency operations as directed by the United States President, United States Congress and the National Command Authority.

Id.

In short, the Sidetrack Agreement involves the lease (acquisition) of property (side tracks) for the direct benefit and use of the government (to transport tanks, weapons, and munitions). It therefore constitutes a contract for "procurement" within the meaning of the CDA. CSX argues nonetheless that "[d]ue to the Georgia Court's ruling, it is now the law of the case that CSX's cause of action is a breach of bailment claim under the Tucker Act" and that "breach of bailment claims are not subject to the CDA." Pl.'s Mem. in Opp'n to Def's Mot. to Dismiss at 7, ECF No. 8 ("Pl.'s Mem."). These arguments lack merit for a number of reasons.

First, irrespective of the law-of-the-case doctrine, "the Court of Federal Claims is obligated to determine its own jurisdiction, even when it receives a matter by transfer from a federal district court." Twp. of Saddle Brook v. United States, 104 Fed. Cl. 101, 107 (2012) (holding that, despite the transferor court's characterization of plaintiff's claims as contract claims against the United States within the exclusive jurisdiction of the Court of Federal Claims, plaintiff's allegations that a contract existed were not sufficient to establish subject matter jurisdiction). Second, the district court did not make any determinations regarding CSX's contract claim, other than a determination that it lacked jurisdiction over that claim. It did not characterize the contract as a "bailment agreement," much less determine that the Tucker Act, but not the Contract Disputes Act, would serve as the basis for the CFC's jurisdiction over the transferred contract claim. To the contrary, the district court declined to address the government's argument that CSX had not "exhausted its administrative remedies under the Contract Disputes Act," expressly leaving resolution of that issue to this Court. See Order at 1, 12, CSX Transp., Inc. v. United States, No. 4:13-cv-208 (S.D. Ga. Sept. 30. 2014), ECF No. 14.

In any event, as described above, the deciding factor in determining whether a contract for the procurement of property or services is subject to the CDA is whether it was "for the direct benefit or use of the Federal Government." Thus, it is beside the point that the CDA does not cover bailment agreements that are donative in nature (because they do not involve procurements); bailments related to the transfer of property pursuant to a lease (like any bailments created by the Sidetrack Agreement) are procurements and therefore are subject to the CDA. See Wesleyan Co. v. Harvey, 454 F.3d 1375, 1378–79 (Fed. Cir. 2006) (holding that a bailment agreement covering a prototype lent to the Army for evaluation did not involve "procurement," but that the Army's subsequent decision to purchase the prototype did); cf. Leonardo v. United States, 60 Fed. Cl. 126, 129 (2004) (government agreement to "solicit additional venues in Belgium and elsewhere in Europe in which to exhibit plaintiff's artwork," to "store and keep safe all of [plaintiff's] artwork . . . at the American Cultural Center at all times when [her] artwork was not being exhibited at additional venues," and "to return her artwork to her in its

7

original condition" was a 'bailment agreement" and not a procurement subject to the CDA); Telenor Satellite Servs., Inc. v. United States, 71 Fed. Cl. 114, 119 (2006) (bailment agreement through which plaintiff provided computer terminals free of charge for use by U.S. Agency for International Development in pilot project was not a procurement and therefore not covered by the CDA).

In short, there is no merit to CSX's claim that its dispute with the government regarding the breach of the Sidetrack Agreement is not subject to the CDA because it involves a "bailment agreement." The Court now turns to the question of whether CSX filed a valid claim with the contracting officer, as is necessary for this Court to exercise jurisdiction under the CDA.

### B. CSX's administrative claim did not constitute a valid claim within the meaning of the CDA

CSX argues, in the alternative, that "this Court would have jurisdiction over CSX's claims even if the Private Sidetrack and Lease Agreement were a procurement contract subject to the requirements of the CDA." Pl.'s Mem. at 10. CSX emphasizes that, in addition to alleging tort causes of action, its administrative claim "specifically identifie[d] the governing contract between the parties" and included the Sidetrack Agreement as an attachment. Id. CSX also notes that its administrative claim "request[ed] payment of a sum certain and request[ed] a final decision from the Army." Id. Further, CSX argues that its administrative claim satisfied the CDA's certification requirement because "a certified public accountant employed by CSX[] 'certif[ied]' the substance of the claim." Id. at 12.

CSX's submission to the Army, although framed as a claim arising under the FTCA and MCA, meets the basic requirements for a claim within the meaning of the CDA as set forth in FAR 2.101. That is, it was "(1) a written demand, (2) seeking, as a matter of right, (3) the payment of money in [the] sum certain" of $267,238.14. See Northrop Grumman Computing Sys., 709 F.3d at 1112. Further, its demand for that sum was "relat[ed] to the contract" in that it cited back to the provision of the Sidetrack Agreement (subparagraph 7.4 at Am. Compl. Ex. A) that holds the Installation responsible "for payment of all damage to any railcar and its contents . . . even if caused by third parties." See id. CSX also included a copy of the Sidetrack Agreement with the claim. As such, the submission likely provided "adequate notice of the basis and amount of the claim." See id.; see also Colon v. United States, 35 Fed. Cl. 337, 341–42 (1996) ("It is theoretically possible that an administrative tort claim could have a breakdown of claimed damages and that some of these damages could in reality be contract-based. A contracting officer may then be in a position to fairly evaluate the claim using information provided in the administrative tort claim.").

But notwithstanding that CSX's claim satisfied these elemental requirements, it clearly does not meet the certification requirement for claims exceeding $100,000 set forth in § 7103(b) of the CDA and incorporated into FAR 2.101. As described above, a certification must affirmatively state that the claim is made in good faith; that the supporting data are accurate and complete to the best of the contractor's knowledge and

belief; that the amount requested accurately reflects the contract adjustment for which the contractor believes the Federal Government is liable; and that the certifier is authorized to certify the claim on behalf of the contractor. 42 U.S.C. § 7103(b)(1). These requirements are more than just a formality. Indeed, the Federal Circuit has held that "the statutory mandate that all claims over [a specified amount] must be certified is one of the most significant provisions of the CDA." Fidelity Const. Co., 700 F.2d 1379, 1384 (Fed. Cir. 1983); see also Lehman v. United States, 673 F.2d 352, 354 (Ct. Cl. 1982) (observing that Congress ascribed importance to the certification requirement as means of averting fraud, discouraging the submission of unwarranted contractor claims, and encouraging settlements).

In asserting that "a certified public accountant employed by CSX, 'certif[ied]' the substance of the claim," CSX refers to a box on Standard Form 95 beneath which appears the signature of Mr. Edward Berlin. See Pl.'s Mem. at 12 (citing Def.'s Mot. App. at 15). The box contains the following language: "I certify that the amount of a claim covers only damages and injuries caused by the incident above and agree to accept said amount in full satisfaction and final settlement of this claim." Def.'s Mot. App. at 15.

Even assuming that this language could be read to affirm that "the amount requested accurately reflects the contract adjustment for which the contractor believes the Federal Government is liable," it certainly does not affirm that "the claim is made in good faith," that "the supporting data are accurate and complete to the best of the contractor's knowledge and belief," or that "the certifier is authorized to certify the claim on behalf of the contractor"—all of which are required for a valid certification under the CDA. See 41 U.S.C. § 7103(b)(1).

There is no merit to CSX's argument that if its certification is not adequate under the CDA's requirements, it should be considered a "defective certification" within the meaning of 41 U.S.C. § 7103(b)(3). Pl.'s Resp. at 12. FAR 33.201 defines a "defective certification" as "a certificate which alters or otherwise deviates from the language in 33.207(c) or which is not executed by a person authorized to bind the contractor with respect to the claim." Because "'[a]lter' and 'deviate' imply some relationship to the original from which they depart," Scan-Tech Sec., L.P. v. United States, 46 Fed. Cl. 326, 337 (2000), courts have interpreted this definition to require a defective certification to at least "resemble the statutory language." Sam Gray Enters., 32 Fed. Cl. 526 at 530.

Under these standards, the language cited by CSX fails to amount to a "defective certification." CSX relies on the certification language of Standard Form 95, which, as noted above, "certif[ies] that the amount of [the] claim covers only damages and injuries caused by the incident above and agree to accept said amount in full satisfaction and final settlement of this claim." Def.'s Mot. App. 1. This certification "does not simply 'alter or otherwise deviate from' the standard certification language." Scan-Tech, 46 Fed. Cl. at 337. It bears no resemblance to the required CDA certification beyond including the word "certify." See id. (holding that "significant words" in the CDA certification beyond "certify" include "best knowledge" and "belief"). Therefore, it must be treated as a failure to certify the claim, not a defective certification. Because of this failure to certify,

9

CSX's claim is not valid within the meaning of the CDA, and this Court lacks subject matter jurisdiction over CSX's action for breach of contract.

## CONCLUSION

For the foregoing reasons, the government's motion to dismiss for lack of subject matter jurisdiction is **GRANTED** and plaintiff's complaint is **DISMISSED** without prejudice.  Each party shall bear its own costs.

**IT IS SO ORDERED.**

s/ Elaine D. Kaplan  
ELAINE D. KAPLAN  
Judge